UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

TELSTAR RESOURCE GROUP, INC.,
on behalf of itself and all others
similarly situated,

                        **Plaintiff,**               **05 Civ. 10671 (JGK)**

       - against -               <u>OPINION AND ORDER</u>

MCI, INC.,

                        **Defendant.**

_____

**JOHN G. KOELTL, District Judge:**

The plaintiff, Telstar Resource Group, Inc. ("Telstar"), brought this action against the telecommunications services provider MCI, Inc.,[1] alleging that MCI violated the Federal Communications Act of 1934 ("FCA"), as amended by the Telecommunications Act of 1996, 47 U.S.C. §§ 151 <u>et</u> <u>seq.</u>, by including in its bills both federal and state fees for universal service funds.  The FCA calls for the federal government to create a universal service fund ("USF") to create the support necessary to provide affordable, modern telecommunications services for low-income customers and those in rural areas and to provide discounts on Internet access to schools, libraries,

_____

[1]  The defendant's submissions indicate that Verizon Business is the successor in interest to MCI following a merger, but the Court will continue to refer to the defendant as MCI, as the parties have done.  (<u>See</u> Decl. of Theresa A. Coetzee, Apr. 4, 2006, ¶ 1.)

and rural health care providers.  <u>See</u> 47 U.S.C. § 254.  The FCA
and Federal Communications Commission ("FCC") regulations
established pursuant to the FCA require "interstate"
telecommunications providers to contribute to the federal USF,
47 U.S.C. § 254(d); 47 C.F.R. § 709, and the FCA also allows
states to require providers of "intrastate" telecommunications
services to contribute to analogous state USFs, if the states
choose to establish them, although these state mechanisms for
providing universal service must be consistent with federal
regulations and must not "rely on or burden" the federal USF, 47
U.S.C. § 254(f).

Telstar contracted with MCI to provide "frame relay
service," a type of direct access service which allows high-
speed data transmission without relying upon public telephone
lines.  (Compl. ¶¶ 5, 10.)  Some "mixed-use" direct access lines
carry both interstate and intrastate traffic.  In its Complaint,
Telstar alleges that the FCC has adopted regulations designed to
separate the jurisdictions of federal and state regulatory
bodies which make it plain that a service provider cannot impose
both federal and state USF surcharges on such a mixed-use direct
access line.  Telstar alleges that, in violation of these
regulations, MCI imposes surcharges for both federal and state
USFs on its direct access lines—including both mixed-use lines

and lines that carry only interstate traffic.

Telstar asserts four claims against MCI: (1) imposing "unjust and unreasonable" USF surcharges in violation of 47 U.S.C. § 201(b); (2) unreasonably discriminating in its charges for communications services by charging both state and federal USF fees for some customers but not others in violation of 47 U.S.C. § 202(a); (3) violating the tariff requirements of 47 U.S.C. § 203(c); and (4) unjustly enriching itself by retaining money it collected via USF surcharges. Jurisdiction for the first three claims arises under 47 U.S.C. § 207 and 28 U.S.C. § 1331, and the Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367. Telstar styles its suit as a class action on behalf of itself and other MCI direct access service customers, seeking an injunction against MCI's alleged double-surcharging practice and an award of damages or restitution, among other relief. Telstar has moved for class certification.

MCI has moved to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). MCI asserts various arguments in support of its motion, including a disagreement that the FCC's jurisdictional separations regulations restrict USF surcharges at all, and an assertion that the Court should refer the matter to the FCC under the

doctrine of primary jurisdiction.

The Court has deferred ruling on Telstar's motion to certify a class and has stayed discovery pending the resolution of this motion to dismiss.

## I.

### A.

On a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the Complaint are accepted as true.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor.  Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Therefore, the defendant's present motion should only be granted if it appears that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief.  See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002) (citing Hishon v. King & Spaulding, 467 U.S. 69, 73

(1984)); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Grandon, 147 F.3d at 188; Goldman, 754 F.2d at 1065.

While the Court should construe the factual allegations in the light most favorable to the plaintiff, the Court is not required to accept legal conclusions asserted in the Complaint. See Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002); Barile v. City of Hartford, 386 F. Supp. 2d 53, 54 (D. Conn. 2005).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001).

**B.**

For the purposes of this motion, the following facts are accepted as true.

MCI is a common carrier, as defined by the FCA and FCC regulations. (Compl. ¶ 28.)  MCI offers a variety of telecommunications services that allow businesses to communicate between multiple offices directly, rather than over public telephone lines. (Id. ¶ 8.)  MCI's "private line services" use a single, dedicated high-speed line to connect different offices.  MCI's billing for its private line services includes a fixed monthly charge based on the quality of service provided and a fixed mileage charge based on the mileage between office locations. (Id. ¶ 9.)  Customers with private line service do not incur per-use fees. (Id.)  MCI's "frame relay services" provide high-speed packet data transmissions without using public telephone lines by establishing "Permanent Virtual Circuits" between locations with port connections. (Id. ¶ 10.)

Telstar entered into a Service Agreement with MCI on July 25, 2005. (Ex. A to Decl. of Theresa A. Coetzee, Apr. 4, 2006.)  The Service Agreement incorporates by reference MCI's Service Publication and Rate Guide ("Guide") (id. ¶ 2), which contains some of the terms of the agreement (Ex. B. to Coetzee Decl.; Def.'s Mem. of Law in Supp. of Its Mot. to Dismiss 5).  The

Service Agreement provides for both "network access," a local service that connects customer offices to an MCI "Point-of-Presence" (Ex. A to Coetzee Decl. ¶ 1; Ex. B. to Coetzee Decl.), and "frame relay" service (Ex. A. to Coetzee Decl. ¶ 1; Ex. B to Coetzee Decl.).  MCI's Guide states that MCI will collect a federal USF surcharge of 10.9% on all charges subject to regulation by the FCC.  (Ex. B to Coetzee Decl.)  The Service Agreement includes a clause titled "Governmental Charges" which states:

> MCI may . . . impose additional rates and charges in order to recover amounts it is required or permitted by governmental or quasi-governmental authorities to collect from or pay to others in support of statutory or regulatory programs ("Governmental Charges"). Examples of such Governmental Charges include, but are not limited to, Universal Service funding . . . .

(Ex. A to Coetzee Decl. ¶ 9.)

MCI's bills to Telstar have included surcharges for both federal and state USFs for the same billing period.  (Compl. ¶¶ 1, 5, 18.)  The state surcharge consists of a "California End User Surcharge."  (Id. ¶ 5; see also Def.'s Mem. 4-5.) California's regulatory body, the California Public Utilities Commission ("CPUC"), requires carriers to "assess, collect, and remit" surcharges to pay for its USF, which supports the Universal Lifeline Telephone Service.  Cal. PUC Gen. Order 153 ¶¶ 2.1.53, 10.1.  The CPUC specifically requires carriers to

surcharge end-users of intrastate telecommunications services to fund the Universal Lifeline program.  (Id. ¶ 10.5.1; see also Def.'s Mem. 5.)

Telstar alleges that MCI's Guide does not set out specific circumstances under which its bill for private line or frame relay service customers will include both federal and state USF surcharges for the same line and the same billing period. (Compl. ¶ 30.)

While MCI bills some customers for both federal and state USF surcharges, it surcharges other customers only for the federal USF or a state USF, but not both.  (Id. ¶ 36.)  MCI also has "reversed, refunded, or credited back" USF surcharges for some customers who were billed for both federal and state USFs, but it has failed to do so for other customers.  (Id.)

Finally, Telstar alleges that MCI has retained some of the money it has allocated to USF surcharges when it has billed customers for both federal and state USFs.  (Id. ¶ 51.)


## II.

Telstar presents a novel theory in support of its case. It asserts that an FCC regulation that classifies mixed-use direct access lines as either "state" or "interstate" lines using a threshold requirement makes it impossible to characterize a

single direct access line as both intrastate and interstate, and hence makes it illegal to surcharge such a line for both state and federal USFs.  This FCC regulation, the so-called "Ten Percent Rule," classifies mixed-use private lines and WATS[2] lines as state lines if the interstate traffic on the line constitutes ten percent or less of the total traffic, and as interstate lines if the interstate traffic on the line constitutes more than ten percent of the total.  47 C.F.R. § 36.154(a)-(b).  The Ten Percent Rule comprises part of the FCC's "jurisdictional separations" procedures, which "are designed primarily for the allocation of property costs, revenues, expenses, taxes and reserves between state and interstate jurisdictions."  Id. § 36.1(b).  A brief discussion of the origin of these jurisdictional separations procedures is necessary to understand the relevance of the Ten Percent Rule to Telstar's claims and to MCI's motion to dismiss.

Before the FCA was passed in 1934, the Supreme Court held that, under the Due Process Clause, a state regulatory agency could not set rates for a local telephone company whose equipment was used for both local (i.e., intrastate) and interstate service without attempting to segregate the revenue

---

[2]  WATS, or "wide area telephone service," is defined in the Glossary to Part 36 of Title 47 of the Code of Regulations.  MCI does not dispute that the types of services referenced in the Ten Percent Rule, 47 C.F.R. § 36.154(a), include the type of direct access service provided to Telstar.

and expenses attributable to local service from that attributable to interstate service.  Smith v. Ill. Bell Tel. Co. 282 U.S. 133, 149 (1930).  The 1934 Act later established the FCC to oversee federal regulation of interstate telephone communications, 47 U.S.C. §§ 151, 152(a), and it excluded from the FCC's jurisdiction the power to regulate intrastate communications, 47 U.S.C. § 152(b).  Pursuant to § 221(c) of the FCA, the FCC established a set of procedures to delineate the appropriate jurisdictions for itself and for state regulators. These procedures were aimed primarily at determining the portions of communications companies' equipment costs that "should be allocated to the interstate and intrastate jurisdictions for ratemaking purposes."  MCI Telecomms. Corp. v. FCC, 750 F.2d 135, 137 (D.C. Cir. 1984).  The FCC has amended these jurisdictional separations procedures numerous times.  See id. at 137–140 (discussing history of jurisdictional separations).

Prior to 1989, the FCC applied the "contamination doctrine" as its separations scheme for direct access lines.  This scheme classified a direct access line carrying any amount of interstate traffic as interstate, and thus subject to federal regulation.  See In the Matter of MTS and WATS Market Structure Amendment of Part 36 of the Commission's Rules and Establishment

of a Joint Board, 4 F.C.C.R. 1352, 1353 ¶ 5 & n.14 (1989).  In

June 1989, the FCC eliminated the contamination doctrine in

favor of the Ten Percent Rule described above.  See MTS and WATS

Market Structure, 4 F.C.C.R. 5660, 5660 ¶ 6 (1989).

MCI disagrees that the Ten Percent Rule, which is part of a

set of procedures originally adopted to allocate costs for the

purpose of ratemaking, imposes a restriction on the states'

ability to impose USF surcharges.  MCI's arguments are addressed

with respect to each of Telstar's claims in the following

discussion.

### A.

Telstar's first claim alleges that MCI has violated

§ 201(b) of the FCA, 47 U.S.C. § 201(b),[3] by assessing "unjust

and unreasonable" surcharges for both federal and state USFs on

private line and frame relay service customers.  (Compl. ¶¶ 26-

33.)  Telstar further alleges that MCI's bills assessing both

surcharges violate the FCC's "Truth-in-Billing" regulations

---

[3]  Section 201(b) reads, in relevant part:  "All charges, practices,
classifications, and regulations for and in connection with such
communication service, shall be just and reasonable, and any such charge,
practice, classification, or regulation that is unjust or unreasonable is
declared to be unlawful . . . ."

Sections 206 and 207 of the FCA allow any person claiming to be damaged by
a telecommunications provider's violation of any FCA provision, including
section 201(b), to bring suit in federal district court or to make a
complaint to the FCC, "but such person shall not have the right to pursue
both such remedies," id. § 207.

because MCI's Service Agreement and Guide fail to set forth
clearly the circumstances under which MCI will "double-tax" the
same direct access line (id. ¶ 30), and it argues that this
failure is also unjust and unreasonable in violation of
§ 201(b).

## 1.

Telstar argues that the Ten Percent Rule precludes MCI from
charging both a federal and state USF fee for a particular
direct access line, and hence that MCI's alleged double-
surcharging practice is "unjust and unreasonable" in violation
of § 201(b).[4]  Telstar concedes that its theory of unreasonable
double surcharges depends upon the conclusion that the Ten
Percent Rule prohibits double surcharges because it requires
that direct access lines be classified as either interstate or
intrastate, but not both, and because this classification
applies to the imposition of both federal and state USF fees.
MCI responds that California imposes its USF fee on intrastate
calls, not on a line's entire revenue according to a percentage-
use threshold such as the Ten Percent Rule.  MCI also contends
that nothing in the Ten Percent Rule applies to

---

[4]  Section 201's applicability to USF charges has been firmly established.
See, e.g., In re Universal Serv. Fund Tel. Billing Pracs. Litig., 247 F.
Supp. 2d 1215, 1220, 1228–29 & n.25 (D. Kan. 2002).

telecommunications carriers' assessment of USF charges.

The statute that enables Universal Service provides for the collection of federal USF fees directly from telecommunications carriers who provide interstate services, 47 U.S.C. § 254(d), and those carriers are allowed to recover the fees from end-users, 47 C.F.R. § 54.712.  See generally In re Universal Serv. Fund Tel. Billing Pracs. Litig., 247 F. Supp. 2d 1215, 1219 (D. Kan. 2002) (describing contributions to the federal USF).  The statute also specifically allows states to create their own USFs and to impose state USF surcharges on telecommunications carriers who provide intrastate services, provided that those surcharges are "equitable and nondiscriminatory" and that they do not "rely on or burden" the mechanism for collecting federal USF fees.  47 U.S.C. § 254(f).  Neither § 254(d) nor § 254(f) specifically delineates the revenue base against which federal or state USF surcharges may be assessed, aside from the conditions just mentioned.  The FCC regulations adopted under § 254 state that carriers "shall contribute on the basis of [their] collected interstate and international end-user telecommunications revenues, net of projected contributions." 47 C.F.R. § 54.706(a); see also id. § 54.706(b) (providing for contributions based on projected revenues in certain circumstances).  These regulations appear to define interstate

telecommunications on a per-transmission basis, see id. § 54.5 (defining interstate telecommunication and interstate transmission), and they make no mention of the Ten Percent Rule. See generally id. §§ 54.1 et seq.

Some courts have invalidated state USF charges assessed against telecommunications carriers because they found that those charges were imposed in part on revenues from interstate services and thus were preempted by the conditions imposed by § 254(f).  See AT&T Corp. v. Pub. Util. Comm'n of Tex., 373 F.3d 641 (5th Cir. 2004) (holding that § 254(f) preempts the state from assessing state USF fees against combined intra- and interstate revenues because of discriminatory effect on mixed-use carriers versus pure interstate carriers); AT&T Commc'ns Corp. v. Eachus, 174 F. Supp. 2d 1119 (D. Or. 2001) (holding that § 254(f) preempts the state from assessing state USF fees against interstate telecommunications services because such assessments improperly "rely on" the same revenues against which federal USF fees are assessed).  These cases do not mention the Ten Percent Rule and instead rely solely upon conflict preemption based on the language of § 254.  In the present case, however, California only purports to impose a charge on intrastate telecommunications services.  See Cal. PUC Gen. Order 153 ¶¶ 2.1.27, 10.5.1.  Moreover, Telstar has specifically

disavowed any intent to assert a violation of § 254 or to claim that the state charge is preempted.  Rather, as Telstar made clear at argument, its theory is limited to the contention that the imposition of both a state and a federal charge on a mixed-use line is a violation of the bright-line classification of the Ten Percent Rule and that violation itself establishes the unreasonableness of the charges pursuant to § 201(b).

Counsel for MCI advised at argument that the way in which MCI calculates its interstate revenue for the purposes of assessing federal USF surcharges for direct access lines is to apply the same threshold principle used in the Ten Percent Rule: It applies the federal surcharge to the revenues from lines over which the interstate traffic comprises more than ten percent of the total.  Like all carriers subject to federal USF contributions, MCI periodically must report its interstate revenues to the FCC using FCC Form 499-Q.  The FCC's instructions for completing this form cite to 47 C.F.R. § 36.154(a), which states the Ten Percent Rule.  <u>See Telecommunications Reporting Worksheet, FCC Form 499-Q: Instructions for Completing the Quarterly Worksheet for Filing Contributions to Universal Service Support Mechanisms</u> 14 (2006). The worksheet and its instructions do not address the proper revenue base for state USF surcharges.  MCI asserts that,

despite the worksheet's reference to 47 C.F.R. § 36.154(a),[5] the Ten Percent Rule itself contains no provision requiring that it be applied to determine revenues for the purpose of calculating federal USF contributions, and MCI further argues that the FCC's jurisdictional separations procedures generally contain no provisions specifically applying to the imposition of USF charges.

At least one federal court of appeals has examined the applicability of the Ten Percent Rule to state telecommunications regulations affecting mixed-use lines, although the case did not relate to USF charges. See Qwest Corp. v. Scott, 380 F.3d 367 (8th Cir. 2004). In response to a complaint by long distance providers who depended upon Qwest to connect customers to their networks, Minnesota's Public Utility Commission issued an order requiring Qwest to provide detailed reporting on the quality of the "special access services" it provided to the long distance providers. Id. at 369. Qwest brought suit, asserting that its special access lines were classified as "interstate" under the FCC's jurisdictional separations procedures, and hence that Minnesota was preempted from regulating those lines. Id. at 370. While the district court accepted Qwest's theory, id., the Court of Appeals for the

_____

[5]  MCI notes that the administrative worksheet was not adopted as part of a formal rulemaking by the FCC.

Eighth Circuit reversed, finding that the FCC's jurisdictional separations procedures (and the Ten Percent Rule in particular) "generally are designed to allocate costs and regulatory authority over ratemaking, rather than plenary authority over a telecommunications service," id. at 373, and thus that the procedures did not express a clear intent to preempt all state regulation over mixed-use special access lines.  The Court of Appeals left room for some state regulation of mixed-use lines that the Ten Percent Rule classifies as "interstate," but it did not directly address a state's power to impose USF surcharges on such lines.

There appears to be no decision establishing the theory of Telstar's case, but neither has any court rejected the theory. Telstar does not rely upon section 254 of the FCA, and it eschews the preemption arguments asserted against state regulatory boards in Texas PUC, Eachus, and Scott in favor of a challenge to MCI's assessment of surcharges under § 201(b) of the FCA and the Ten Percent Rule.  The FCC's jurisdictional separations scheme, to which the Ten Percent Rule belongs, arose to guide cost allocation for the purposes of ratemaking, and it does not appear to apply expressly to the calculation of USF contributions.  And yet, MCI concedes that it applies the rule to calculate its federal USF contributions, and the FCC

publication describing USF contributions cites directly to the
rule itself.  This publication does not say that states are
bound to abide by the Ten Percent Rule in assessing their own
USF charges, but in light of the FCC's apparent use of the rule
outside of its original ratemaking context, the Court cannot say
with certainty how far and wide the FCC intends the rule to
apply.  For this reason, the Court cannot say as a matter of law
that an imposition of USF surcharges that is inconsistent with
the Ten Percent Rule cannot be found "unreasonable" under §
201(b) of the FCA.

### 2.

In reference to Telstar's alternative allegation that MCI
violated section 201 by failing to comply with the FCC's Truth-
in-Billing requirements, MCI argues that the statements in its
Service Agreement and Guide adequately put Telstar on notice
that state and federal USF surcharges could be assessed.[6]  The
Truth-in-Billing regulation states:

> Charges contained on telephone bills must be
> accompanied by a brief, clear, non-misleading, plain
> language description of the service or services

---

[6]  MCI's assertion that this alternative argument was first asserted in
Telstar's opposition brief is belied by the Complaint, which states that
"wrongly classifying Direct Access Lines as both interstate and intrastate
for USF assessment purposes" violates the FCA (Compl. ¶ 17) and that MCI's
Service Agreement and Guide "fail to clearly set forth the circumstances
under which MCI will classify Direct Access Lines as both interstate and
intrastate" (id. ¶ 30).

> rendered.  The description must be sufficiently clear
> in presentation and specific enough in content so that
> customers can accurately assess that the services for
> which they are billed correspond to those that they
> have requested and received, and that the costs
> assessed for those services conform to their
> understanding of the price charged.

47 C.F.R. § 64.2401(b).  While MCI's Service Agreement adverts to potential "Governmental Charges" (Ex. A to Coetzee Decl. ¶ 9.), it does not state that both state and federal USF surcharges may be assessed on the same direct access line.  More important, however, is Telstar's allegation that MCI's bills for direct access line subscribers include line items for both federal and state USF surcharges.  MCI argues that because Telstar admits that MCI did not hide these surcharges, the bills cannot be "misleading" in violation of the Truth-in-Billing regulation.  This statement is too grudging, however, because it is at best unclear from the Complaint whether MCI makes it clear that it is charging both federal and state USF surcharges on the same line.

### 3.

As an alternative to dismissing the Complaint, MCI argues that this Court should stay or dismiss any surviving federal claims under the primary jurisdiction doctrine to allow the FCC to consider the issues first.

As noted above, federal courts have concurrent jurisdiction with the FCC over actions seeking damages pursuant to 47 U.S.C. § 207.  The doctrine of primary jurisdiction, however, "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., 46 F.3d 220, 222-23 (2d Cir. 1995) (quoting Far East Conf. v. United States, 342 U.S. 570, 574 (1952)); see also United States v. Western Pac. R.R. Co., 352 U.S. 59, 63-64 (1956).  The "doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." Western Pac., 352 U.S. at 63.  Courts apply the doctrine to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency.  Goya Foods, Inc. v. Tropicana Prods., Inc., 846 F.2d 848, 851 (2d Cir. 1988).  The primary rationales for invoking the doctrine include the need to establish uniform standards and the importance of administrative expertise.  Tassy v. Brunswick Hosp. Ctr., Inc., 296 F.3d 65, 67-68 (2d Cir. 2002).

There is no fixed formula to determine whether an administrative agency has primary jurisdiction.  Western Pac., 352 U.S. at 64; Nat'l Commc'ns, 46 F.3d at 222-23.  Courts generally consider four factors in determining whether to refer a matter to an administrative agency under the doctrine:  (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.  Nat'l Commc'ns, 46 F.3d at 222-23.  A court is also required to "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings."  Nat'l Commc'ns, 46 F.3d at 223.

When a court determines that the doctrine of primary jurisdiction is applicable, "the judicial process is suspended pending referral of such issues to the administrative body for its views."  Western Pac., 352 U.S. at 64; see also Reiter v. Cooper, 507 U.S. 258, 269 n.3 (1993) (quoting Mitchell Coal & Coke Co. v. Pa. R.R. Co., 230 U.S. 247, 267 (1913)) (noting that

the court should stay the action to allow the plaintiff to apply to the administrative agency for a clarifying ruling).

Courts have commonly found that claims alleging "unreasonable" practices in violation of § 201(b) of the FCA are within the primary jurisdiction of the FCC. See, e.g., In re Long Distance Telecomms. Litig., 831 F.2d 627, 631 (6th Cir. 1987) ("Section 201(b) speaks in terms of reasonableness . . . . This is a determination that Congress has place squarely in the hands of the [FCC]." (internal quotation marks omitted)); Niehaus v. AT&T Corp., 218 F. Supp. 2d 531, 536–37 (S.D.N.Y. 2002); MCI Telecomms. Corp. v. Dominican Commc'n Corp., 984 F. Supp. 185, 189–90 (S.D.N.Y. 1997); Vortex Commc'ns, Inc. v. Am. Tel. & Tel. Co., 828 F. Supp. 19, 20–21 (S.D.N.Y. 1993); cf. Ambassador v. United States, 325 U.S. 317, 324 (1945) ("[W]here the claim of unlawfulness of a regulation is grounded in lack of reasonableness, the objection must be addressed to the [FCC] and not as an original matter brought to the court."); Nat'l Commc'ns, 46 F.3d at 223 (declining to apply the primary jurisdiction doctrine to a case involving the enforcement of a tariff, rather than "a challenge to the reasonableness of a tariff"). Because Telstar's first claim asserts that MCI's billing practices are "unreasonable" in violation of § 201(b),

the weight of this authority suggests that deferring to FCC judgment is the better course.

Although Telstar casts its claim as the application of a bright-line FCC regulation, the foregoing discussion suggests that the relevance of the Ten Percent Rule to USF surcharges is not at all clear.  Telstar's theory is a novel one, and thus not within the "conventional experience of judges."  The process for recouping USF contributions by surcharging customers with certain telecommunications lines, as well as the nature of the direct access lines involved in this case, raise technical questions with which the FCC is unquestionably more familiar than federal courts.  Furthermore, as Telstar's theory depends so heavily on the proper interpretation of an FCC regulation, the FCC's discretion is very much implicated.  The first two of the four factors thus weigh in favor of deferring to the FCC to resolve this issue.

As for the danger of inconsistent rulings, while no court has as yet ruled on Telstar's theory that the Ten Percent Rule prohibits "double-taxing" of USF fees, the <u>Scott</u> court has limited the Rule's applicability in the context of other state regulatory acts.  The <u>PUC of Texas</u> and <u>Eachus</u> cases have invalidated state USF fees in both Texas and Oregon as applied to interstate services on other grounds.  The validity of state

USF surcharges under an FCC regulation would have national ramifications, and the possibility of inconsistent or incongruous rulings thus could arise if the FCC does not clarify the extent to which its jurisdictional separations procedures apply, if at all, to USF surcharges.  The third factor therefore also militates in favor of deference to the FCC's judgment.

Because the parties have not indicated that any prior application to the FCC has been made, the fourth factor weighs against applying the primary jurisdiction doctrine.  See Ellis v. Tribune Television Co., 443 F.3d 71, 89 (2d Cir. 2006) (clarifying that where prior application to the agency has been made, this factor supports applying the doctrine of primary jurisdiction); see also United States v. Gabelli, 345 F. Supp. 2d 340, 357 (S.D.N.Y. 2004).  Because the issue is not already pending before the FCC, staying this action could result in a substantial delay in the proceedings.  See Gabelli, 345 F. Supp. 2d at 357.  But, because the case was filed only about one year ago and because discovery is stayed, the costs of deferring to the FCC are not excessive.

Where, as here, only the fourth factor weighs against applying the doctrine, courts have in the past stayed or dismissed actions pending FCC review.  See, e.g., LO/AD Commc'ns, B.V.I., Ltd. v. MCI WorldCom, No. 00 Civ. 3594, 2001

WL 64741, at *6 (S.D.N.Y. Jan. 24, 2001).  Balancing the
significant advantages of achieving a uniform understanding of
the Ten Percent Rule's applicability to USF surcharges against
the delay and other costs of applying the doctrine, the Court
finds it appropriate to **stay** proceedings with respect to the
first claim pending resolution of the outstanding issues by the
FCC.

Because the FCA does not provide a mechanism whereby the
Court can directly refer the matter to the FCC, it is incumbent
upon the parties to file an administrative complaint.  See
Dominican Commc'n Corp., 984 F. Supp. at 189 n.3 (citing Reiter
v. Cooper, 507 U.S. 258 (1993)).  It is appropriate for the
Court to stay, rather than dismiss, the proceedings because the
FCC rules do not provide for class actions or the award of
attorneys' fees, and hence this Court may provide the only forum
capable of providing the remedy the plaintiff seeks.  See Long
Distance Telecomms. Litig., 831 F.2d at 632 (class actions
unavailable before the FCC); Nat'l Commc'ns Assoc. v. AT&T
Corp., 238 F.3d 124, 132 n.5 (2d Cir. 2001) (same for attorneys'
fees).[7]

---

[7]  The Court has considered all of MCI's additional arguments in support of
dismissing Telstar's first claim and finds them to be either moot or without
merit.

**B.**

Telstar's second claim alleges that MCI has violated § 202(a) of the FCA, 47 U.S.C. § 202(a),[8] by unreasonably discriminating against the plaintiff and putative class members by surcharging them for both federal and state USFs on private line and frame relay services while MCI surcharges other customers only for a state or federal USF, but not both. (Compl. ¶¶ 34-39.)  Telstar further alleges that MCI "reversed, refunded, or credited back USF surcharges" to some customers who were double-surcharged, but failed to do so for others.  (Id. ¶ 36.)

To plead a § 202(a) discrimination claim, a plaintiff must show three elements:  (1) that the services are "like," (2) that "the carrier is offering the service to other customers at a 'different' price or under 'different' conditions than those offered to [the plaintiff]," and (3) that the differences are "unreasonable."  Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 199 (2d Cir. 2001); see also Nat'l Commc'ns Assoc., 238

---

[8]  Section 202(a) provides, in relevant part:
    It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in conjunction with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

F.3d at 127.  While the plaintiff bears the burden of proving
the first two elements, the communications provider bears the
burden of justifying the different treatment of like services as
"reasonable."  Panatronic USA v. AT&T Corp., 287 F.3d 840, 843
(9th Cir. 2002); Nat'l Commc'ns Assoc., 238 F.3d at 129-31; MCI
Telecomms. Corp. v. FCC, 917 F.2d 30, 39 (D.C. Cir. 1990).

    Telstar has not met the first element because it has not
alleged that other customers who were not double-taxed for USF
fees subscribed to "like" services.  Telstar in fact fails to
allege that other customers who were not double-taxed have
direct access lines with similar components to the lines used by
Telstar and other putative class members.  Telstar's Complaint
also lacks particularity with respect to whether the customers
who were refunded USF charges subscribed to services like
Telstar's.  While the "likeness" inquiry was usually
straightforward in the era of tariffs, when a court could simply
look to whether two customers treated differently subscribed to
the same tariff, the rise of private contracts with variable
terms after detariffing necessitates the allegation of specific
facts to meet the first element required to bring a § 202(a)
claim.  Cf. Orloff v. FCC, 352 F.3d 415, 419 (D.C. Cir. 2003).

    Telstar's second claim is thus **dismissed, with leave to
amend**, for failure to allege that the class members were

discriminated against relative to other customers with "like" services.  While Telstar might cure this defect of its pleading, it should note that the reservations expressed above about its novel theory that the Ten Percent Rule renders double-surcharging of USF fees illegal are likely to arise with similar force in considering the "unreasonableness" of MCI's conduct under § 202(a).  Hence, were this claim not dismissed, the primary jurisdiction doctrine would apply and this Court would stay consideration of it pending a determination by the FCC, for the same reasons discussed above in relation to Telstar's § 201(b) claim.

### C.

In light of the fact that Telstar's frame relay service is bound by contract, rather than tariff, and because § 203 of the FCA only requires service providers to charge rates specified in their filed tariffs, Telstar has agreed to withdraw its claim under § 203(c).  Accordingly, the third claim is **dismissed**.

### D.

Telstar's fourth claim for unjust enrichment alleges that MCI wrongfully double-surcharged Telstar and other putative class members and retained money from those surcharges.  Under

New York law,[9] to bring a claim for unjust enrichment a plaintiff must allege that (1) the defendant was enriched, (2) the enrichment was at the plaintiff's expense, and (3) the circumstances were such that equity and good conscience require the defendant to make restitution.  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (citing Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983)).

MCI argues that the unjust enrichment claim is precluded when, as here, the parties have entered into of a valid contract.  Under New York law, the existence of a contract governing a particular dispute normally forecloses recovery by an unjust enrichment theory.  See, e.g., Md. Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 212 (2d Cir. 2000) ("The notion of unjust enrichment applies where there is no contract between the parties . . . ."); Liu v. Beth Israel Med. Ctr., No. 02 Civ. 2034, 2003 WL 21488081, at *4 (S.D.N.Y. June 26, 2003); Malouf v. Salomon Smith Barney, Inc., No. 02 Civ. 4770, 2003 WL 1858153, at *6 (S.D.N.Y. Apr. 10, 2003); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).  An exception to this rule exists in cases where there is a "bona

---

[9]  The parties do not address choice of law directly, but they apply New York law in their briefs, and the plaintiff is a resident of New York.  The Court will therefore accept the parties' implicit agreement to the application of New York law.  See, e.g., Hannex Corp. v. GMI, Inc., 140 F.3d 194, 203 n. 7 (2d Cir.1998); Phila. Indem. Ins. Co. v. Horowitz, Greener & Stengel, LLP, 379 F. Supp. 2d 442, 452 n.4 (S.D.N.Y. 2005).

fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue." <u>Joseph Sternberg, Inc. v. Walber 36th St. Assocs.</u>, 594 N.Y.S.2d 144, 146 (App. Div. 1993); <u>see also</u> <u>Liu</u>, 2003 WL 21488081, at *5.

Telstar does not dispute that it procured frame relay service from MCI pursuant to a written agreement, so there is no "bona fide dispute" as to the existence of a valid contract. Because MCI's Service Agreement states that MCI may recover applicable "Governmental Charges" (Ex. A to Coetzee Decl. ¶ 9), the dispute over whether MCI wrongly retained fees described as USF surcharges falls within the four corners of the contract into which the parties entered.  Therefore, the exception stated in <u>Joseph Sternberg</u> does not apply.  The fourth claim is **dismissed**.


                              **CONCLUSION**

For the reasons stated above, Telstar's first claim is **stayed** pending the FCC's consideration of the relevance of its existing jurisdictional separations procedures to the assessment of federal and state USF surcharges on mixed-use direct access lines.  The second claim is **dismissed with leave to amend**, but, if the plaintiff amended this claim, it would also be stayed pending the consideration of the issues raised in the first

claim.  The third and fourth claims are **dismissed** for failure to state a claim upon which relief can be granted.

**SO ORDERED.**

Dated:      New York, New York
            January 17, 2007

                                        John G. Koeltl
                                  United States District Judge